**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Darren Monroe, | ) | CASE NO. 1:12CV1117 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| Jason Bunting, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Darren Monroe ("Monroe"), challenges the constitutionality of his conviction in the case of *State v. Monroe*, Cuyahoga County Court of Common Pleas Case No. CR-07-505319.  Monroe, represented by counsel, filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on May 4, 2012.  (Doc. No. 1.)  On August 2, 2012, Warden Jason Bunting ("Respondent") filed his Answer/Return of Writ.  (Doc. No. 9.)  Monroe filed a Traverse on August 31, 2012.  (Doc. No. 10.)  For reasons set forth in detail below, it is recommended that Monroe's Petition be DENIED.

I.     **Factual Background**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Monroe's conviction as follows:

In the early morning hours of December 22, 2007, David Bober was shot and killed near his home on West 48th Street in Cleveland, Ohio. Prior to that time, David had been drinking with his brother Raymond and his friend Milton. According to Raymond and Milton, the men consumed excessive amounts of alcohol, which they estimated at approximately 16 to 18 beers and two to eight shots apiece. Raymond and Milton also admitted to using cocaine that evening as well; however both men said David did not use cocaine that night.

Around 3 a.m., David drove Raymond's car home with Raymond as a passenger. Milton followed behind them in his own car to make sure they arrived safely. David lived on W. 48th Street. Milton and Raymond admitted they were highly intoxicated but maintained David and Milton could operate the vehicles.

In the area of W. 48th Street and Koch Court, Raymond heard David exchange words with someone. Raymond did not see anyone but noticed David was agitated. FN 1. David parked the car behind his house and ran through the alley up to W. 48th Street. Raymond followed about twenty seconds later. At that point, Raymond heard gunshots and saw David running back towards him. Raymond shouted, "we're cool, we're cool" in an effort to stop the gunfire. The person kept shooting at them. Street lights were on and Raymond saw a man standing in the street approximately ten to 20 feet away from him. Raymond believed the person was wearing a hooded jacket, which he later described as a "big jacket." He got a good look at the individual's face but said "his height and weight threw me off." Raymond explained that he is not good at estimating height and weight and could only describe the shooter's body type as being between thin and real heavy.

FN 1 Raymond said he was crouched down in the car because he was concerned about David's erratic driving.

Raymond and David ran towards David's house. Raymond observed David limping and still heard gunshots. About five shots were fired. Then, Raymond saw David collapse after being hit through the back. He was running for his life and did not turn back around to see where the shooter was standing. Raymond tripped over David, turned David over and saw blood coming out of David's chest. Raymond rode in the ambulance with David to the hospital but returned to the scene after learning that David was dead. Raymond acknowledged that he was intoxicated during the event and was also in a state of shock.

Raymond gave a description to police that night where he estimated the shooter's height as approximately six feet and his weight as 180 pounds. At

trial, however, Raymond said "the description, the height and the weight at that time couldn't have been right."  Police did not show Raymond a line-up nor did they ask him to identify anyone from a photo array.

Milton corroborated much of Raymond's testimony about the evening.  He saw David turn right onto Koch Court but does not recall seeing anyone near the intersection.  He went to the side door of David's house expecting to be let inside.  Instead, he heard David arguing with someone towards the front of the house.  David was aggravated and sounded angry or mad.  Milton did not recognize the other voice but it was a man who also sounded aggravated.  Milton ran to the front of the house and saw Raymond and David on one side of Koch Court and a man on the other side of the street near a car.  Raymond was trying to break up the argument.  Although the street lights were on, the man was standing in a shadow area and wore all black.  Like Raymond, Milton had difficulty determining the man's height and estimated it was between 5'10" to 5'11".  It was a black male who appeared to weigh more than 250 lbs.

Milton started running and heard gunfire.  David came up behind him, said "I'm hit" and fell over.  Milton called 911 and was in a panic.  Milton gave a statement to police that night but was devastated by his friend's death.  Milton described himself as being "out of control."  Police asked him to look at someone near the intersection under the street light but he did not think it was the shooter.  He was closer to this person than he was to the shooter.  Raymond got closer to the shooter than Milton did.  Milton did not observe any other people in the area at the time of the shooting besides David, Raymond, and the shooter.

Officers who responded to the scene described Raymond and Milton as intoxicated with slurred speech.  Police received information via 911 from an anonymous caller who claimed to have witnessed the crime.  The 911 tapes that related to the shooting were introduced and Dennis Smith authenticated his voice as the caller.  As a result of these calls, the crime scene was expanded to include the area of 3289 W. 48th Street, which was defendant's residence as well as the residence of Dennis Smith's son.

Dennis Smith explained that his son Dan had witnessed the shooting and asked him to make the call.  Dan was afraid to get involved because he recognized his neighbor, who is the defendant, as the shooter.  Dennis said he made the 911 calls because he was in fear for his son's life.  The trial court provided a limiting instruction to the jury specifically instructing that the 911 tapes were not being offered to prove the truth of the matters asserted in them but for a different purpose.  During his trial testimony, Dennis admitted to the jury that he was not at the scene that night contrary to what he had said on the

911 tapes.  He acknowledged that his first 911 call was false because he was not an eyewitness.  In a subsequent 911 call, Dennis Smith disclosed that he was not an eyewitness but was relaying information provided by his son, Dan.

Police testified that bullets bounce when they hit a hard surface and are not always found at the exact location from which they were expended. Photographs taken from the scene on the night of the shooting reflect that there was water on the ground.  Police radio communications alerted the officers that the shooter was a heavyset black male.

Dan Smith lived in the same building as defendant on December 22, 2007. Dan was living with his girlfriend Crystal Demopoulos.  He was familiar with defendant's voice and had observed him standing and walking on previous occasions.

Dan and Crystal were awake between 4 and 5 a.m. that day.  Crystal was watching Dan play video games on a gaming system she gave him that day as a Christmas gift.  They heard an argument outside.  Crystal went to the window first and Dan later got up to look outside as well.

Dan saw defendant wearing darker clothes standing and talking on the phone. He saw a group of people across the street.  Defendant shot a couple times towards the group of three to four white people.  They were all moving.  Dan believed they were going towards their house.  After the shooting, Dan heard defendant say nonchalantly, "I just had to shoot this guy."  Dan identified defendant as the shooter but said defendant was about 80 pounds heavier at the time of his trial.  According to Dan, defendant has a distinct walk and voice.

Dan saw one shot but heard approximately three to four shots fired. Defendant started shooting in the driveway and moved out to the street. Crystal watched the incident longer than Dan did.  Dan was on the floor and pulled Crystal down for safety.

Dan wanted to remain anonymous but called his dad as well as 911.  He did this because he noticed that the police were looking in the wrong area.  He saw the police expand the crime scene after he provided them information.

Dan observed defendant around one of the cars and moving towards the street near the apron of the driveway.  Dan was about 20 to 25 feet away.  He was unsure if there were six to eight black males on the street.  In his previous testimony, Dan said he saw 6 to 8 black males in hoods walking across the street.  The blinds were down on his windows.

-4-

Crystal testified that she heard arguing and went to the window to look out of the blinds. She saw defendant walking to the back with a man she did not recognize but who was white with a slender build. Defendant was wearing a black hooded sweatshirt. She later saw defendant shooting a gun near the apron of the driveway. She recognized defendant. Dan eventually pulled her down to the ground and then the couple gathered their dogs and turned off the lights in their apartment. They were afraid and did not want to be involved.

Crystal heard about three to four shots. Crystal also heard defendant on the phone saying he shot someone. Defendant went back to his house. The couple was scared and abruptly moved out of that residence a few days later. Crystal testified that she did observe a group of people crossing Koch Court whom she believed were all males. However, she did not see these individuals do anything in connection with the shooting. Det. Everett, who took Crystal's statement, testified that there was no physical evidence found on the scene that would indicate that these unidentified six to eight males played any role in the shooting.

Dan was not able to make an identification from the photo array but insisted he could identify his neighbor if he saw him. Crystal was able to immediately identify defendant's photograph from the array as the shooter.

Both Dan and Crystal testified that they had previous encounters with the defendant before witnessing the shooting. They described incidents where defendant threatened to kill their dogs and also an occasion where Dan insisted that defendant turn down the radio. Defendant resided in the W. 48th residence for approximately one month prior to the shooting.

David's live-in girlfriend, Beatrice Lee, testified that she was awakened by banging on the door on December 22, 2007. She opened the door and saw Milton on his cell phone and David in Raymond's arms. Raymond was saying, "he's gone."

Police recovered two bullet casings that were found near a manhole cover at the intersection of W. 48th and Koch Court around 6 a.m. on December 22, 2007. This was consistent with the location of the shooter as described by Raymond and Milton.

Various officers testified about the investigation that took place on that day. Lt. Foley was in charge of the crime scene. Lt. Foley brought defendant out of his house and into the street for a potential cold stand identification by Milton.

Prior to Lt. Foley's testimony the court held an extensive hearing on

-5-

defendant's objections to portions of his anticipated testimony, specifically non-verbal communications made by persons who were not testifying at trial. The trial court made various rulings and Lt. Foley was given precise parameters as to the scope of his testimony before the jury. He was allowed to give only limited testimony as to the details of his investigation, which the defense agreed was permissible.  The court indicated that Lt. Foley could testify that "based on what he learned, [he] was suspicious of what [he] saw." However, the court otherwise sustained the defense objection and prohibited Lt. Foley from testifying about certain facts that had lead him to defendant's residence.

Lt. Foley explained that he saw individuals hanging out of a window.  He then went to defendant's residence and a woman opened the door.  About ten seconds later, a heavyset man walked into the kitchen area and was wearing pajama pants.  Lt. Foley asked the man if he had been outside and the man said no. However, Lt. Foley observed wetness on the bottom of the man's pajama pants, which made him disbelieve the man's statement that he had not been outside.  For that reason, Lt. Foley decided to bring him out for a cold stand identification procedure.  This man was defendant. Ultimately, Milton did not identify defendant as the shooter and he was released.

Officers Wagner and Katyinski assisted Lt. Foley in the investigation. Officer Wagner testified that he noticed that the bottoms of defendant's pants were wet and he did not observe defendant walking through any water.  Wagner also testified that defendant appeared to have gained weight since the time of the shooting.   Wagner corroborated that Milton was unable to identify defendant as the shooter.

The trial court also allowed the testimony of the Cuyahoga County Coroner, Dr. Frank Miller, over defendant's objection.  Dr. Miller testified concerning the autopsy report completed for David Bober, the decedent.  Although Miller was not personally present for the autopsy, it was performed by individuals under the employ and supervision of his department but who were no longer available to testify.  The records confirmed that David had consumed at least nine to ten drinks but did not indicate the presence of any cocaine in his system.

Investigators did not find any fingerprints on the recovered shell casings or any DNA linking defendant to the crime scene.

*State v. Monroe*, 2011 WL 2476280 at ** 1- 5 (Ohio App. 8th Dist. June 23, 2011).  *See also* Doc. No.

9-1, Exh. 24.

-6-

## II.   **Procedural History**

### A.   **Monroe's First Trial**

On January 3, 2008, a Cuyahoga County Grand Jury charged Monroe with one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A) together with a three-year firearm specification and two mass murder specifications.  Monroe was also charged with two counts of attempted murder in violation of O.R.C. § 2923.02/2903.02(A) together with three-year firearm specifications. (Doc. No. 9-1, Exh. 2.)   He was arraigned on January 7, 2008 and pled not guilty to all charges.

A jury trial commenced on July 21, 2008.  On July 28, 2008, after the State rested, Monroe moved for acquittal pursuant to Ohio Crim. R. 29(A), which the trial court granted as to the element of prior calculation and design.  The mass murder specifications to Count 1 were also deleted.  Thereafter, on July 31, 2008, the jury found Monroe guilty of murder (including the three-year firearm specification) and not guilty of the attempted murder charges.

On August 13, 2008, Monroe filed a motion for a new trial.  After a hearing on September 10, 2008, the court granted the motion and vacated the jury's verdict on the grounds it was against the manifest weight of the evidence.  (Doc. No. 9-1, Exh. 9.)

The State appealed, arguing the trial court erred when it (1) granted a new trial based on purported inconsistent verdicts; and (2) held that minor inconsistencies and possible bias rendered Monroe's conviction infirm.  (Doc. No. 9-1, Exh. 15.)   On September 24, 2009, the trial court's ruling was affirmed.  *See State v. Monroe*, 2009 WL 3043261 (Ohio App. 8th Dist. Sept. 24, 2009). *See also* Doc. No. 9-1, Exh. 18.   The State did not appeal this decision to the Ohio Supreme Court.

-7-

### B.        Monroe's Second Trial

On January 25, 2010, Monroe's second trial commenced.  Four days later, on January 29,

2010, the jury found Monroe guilty of the inferior offense of voluntary manslaughter in violation

of O.R.C. § 2903.03 and the three-year firearm specification. (Doc. No. 9-1, Exh. 19.)   The trial

court thereafter sentenced Monroe to a term of imprisonment of three years on the firearm

specification to be served prior to and consecutive with an eight year term on the voluntary

manslaughter charge. (Doc. No. 9-1, Exh. 1.)[1]

### C.        Direct Appeal

Monroe, through counsel, timely appealed to the Court of Appeals for the Eighth Appellate

District ("state appellate court"), raising the following nine assignments of error:

> I.        Defendant was denied due process of law and a fair trial when the
>          Court permitted the officer in charge of the scene to testify to the truth
>          of statements attributable to defendant.
>
> II.       Defendant was denied his right of confrontation and cross-examination
>          when the court permitted hearsay information.
>
> III.      Defendant was denied due process of law and a fair trial when the
>          Court permitted Dan Smith, a prosecution witness, to read his entire
>          police statement to the jury.
>
> IV.       Defendant was denied his constitutional right of confrontation when
>          the Court allowed a non-examining coroner to testify as to the cause of
>          death, whose testimony the Court enhanced before the jury.
>
> V.        Defendant was denied due process of law and his right of
>          confrontation when the Court admitted 911 calls from Dennis Smith.

--------------------------------------------

[1]        In the Return, Respondent states Monroe was sentenced to an aggregate term of
14 years (i.e. 3 years on the firearm specification consecutive to 11 years on the
voluntary manslaughter charge).  The state trial court's sentencing entry,
however, indicates an aggregate term of 11 years. (Doc. No. 9-1, Exh. 1.)

-8-

VI.    Defendant was denied due process of law by reason of the conflicting and inconsistent instruction of voluntary manslaughter.

VII.   Defendant was denied due process of law when the Court improperly instructed on causation.

VIII.  Defendant was denied due process of law when the defendant was convicted of voluntary manslaughter.

IX.    Defendant was denied due process of law when the Court overruled his motion for judgment of acquittal and the verdict is against the manifest weight of the evidence.

(Doc. No. 9-1, Exhs. 21, 22.)  On June 23, 2011, Monroe's conviction and sentence were affirmed.  *State v. Monroe*, 2011 WL 2476280 (Ohio App. 8th Dist. June 23, 2011).  *See also* Doc. No. 9-1, Exh. 24.

On September 7, 2011, Monroe timely filed, through counsel, a notice of appeal to the Ohio Supreme Court. (Doc. No. 9-1, Exh. 28.)  In his merit brief, Monroe raised the following nine propositions of law:

I.     A defendant has been denied due process of law and a fair trial when a police officer testifies to the truth of the statement attributable to defendant.

II.    A defendant has been denied his right of confrontation and cross-examination when the Court allows witnesses to relate information gathered from un-testifying [sic] witnesses.

III.   A defendant has been denied due process of law and fair trial when the court permits a witness to read his entire police statement to the jury.

IV.    A defendant has been [denied] his right of confrontation when the Court permits a non-examining coroner to testify as [to] the cause and manner of death by reading from a report made by a non-testifying coroner.

V.     A defendant has been denied due process of law and the right of confrontation when the Court admits 911 calls from a witness who was relating what was told by another person.

-9-

VI.    A defendant has been denied due process of law where a court uses a
conflicting and inconsistent instruction on the elements of voluntary
manslaughter.

VII.   A defendant has been denied due process of law when the Court
improperly instructs on the issue of causation.

VIII.  A defendant has been denied due process of law when he was
convicted of voluntary manslaughter where he has failed to produce
any evidence of passion or fit of sudden rage brought on by serious
provocation.

IX.    A defendant has been denied due process of law where a Court fails to
award a new trial based on the manifest weight of the evidence when
the evidence is inconsistent, contradictory, and incredible.

(Doc. No. 9-1, Exh. 29.)   On December 21, 2011, Monroe's appeal was dismissed as not

involving any substantial constitutional question. (Doc. No. 9-1, Exh. 30.)

Monroe did not pursue post-conviction relief, nor did he seek to re-open his appeal

pursuant to Ohio App. R. 26(B).

**D.      Federal Habeas Petition**

On May 4, 2012, Monroe filed a Petition for Writ of Habeas Corpus, asserting the

following seven grounds for relief:

**GROUND ONE: SIXTH AND FOURTEENTH AMENDMENT**

Supporting Facts: Petitioner was denied due process of law and a fair trial when a
police officer usurped the province of the jury when he testified as to the truth of
a statement attributable to petitioner.

**GROUND TWO: SIXTH AND FOURTEENTH AMENDMENT**

Supporting Facts: Petitioner was denied his right of confrontation and cross-
examination when the court allowed witnesses to relate information gathered
from non-testifying witnesses.

**GROUND THREE: SIXTH AND FOURTEENTH AMENDMENT**

-10-

Supporting Facts: Petitioner was denied due process of law and a fair trial when the court permitted a witness to read an entire police statement to the jury in an effort to bolster the testimony of that witness.

**GROUND FOUR: SIXTH AND FOURTEENTH AMENDMENT**

Supporting Facts: Petitioner was denied his right of confrontation and cross-examination when the court permitted a non-examining coroner to testify as to the cause and manner of death by merely reading a report made by another coroner who did not testify.

**GROUND FIVE: SIXTH AND FOURTEENTH AMENDMENT**

Supporting Facts: Petitioner was denied due process of law and the right of confrontation when the court admitted 911 calls from a witness who was only relating what he was told by another person and did not personally witness what he was relating to police dispatch.

**GROUND SIX: FOURTEENTH AMENDMENT**

Supporting Facts: Petitioner was denied due process of law when the court gave a conflicting and inconsistent instruction concerning the elements of voluntary manslaughter.  Moreover, the court improperly instructed the jury on the issue of causation.

**GROUND SEVEN: FOURTEEN [SIC] AMENDMENT**

Supporting Facts: Petitioner was denied due process of law when he was convicted of voluntary manslaughter where petitioner did not testify and did not produce any evidence of passion or fit of sudden rage brought on by serious provocation.  Moreover petitioner was denied a new trial based on the manifest weight of the evidence where the evidence was inconsistent, contradictory and totally incredible and beyond belief.

(Doc. No. 1 at 3-4.)  Respondent filed a Return on August 2, 2012 (Doc. No. 9) and Monroe

thereafter filed his Traverse on August 31, 2012 (Doc. No. 10.)

**III.    AEDPA Standard of Review**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

-11-

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002))  The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision

involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. This is a very high standard, which

the Court readily acknowledges. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")[2]

## IV.     Analysis

### 1.      Ground One

In his first Ground for Relief, Monroe argues the trial court erred when it allowed Lieutenant Foley to testify that he believed Monroe was untruthful when stating he had not been outside on the night of the murder.  Monroe also argues "this error was compounded" when the court allowed Detective Everett to testify that he had concluded there was no physical evidence to show a group of six to eight unidentified black males played any role in the death of Mr. Bober. (Doc. No. 10 at 12-13).

Lieutenant Foley testified he was working on December 22, 2007 and responded to the crime scene in the vicinity of W. 48th Street and Koch Court.  (Doc. No. 9-5 at 221-222).  He stated he went to the back door of Monroe's house, knocked on the door, and spoke to an unidentified female who answered.  *Id*. at 248- 251.  Monroe then came to the front door and indicated he had been in bed and had not been outside.  *Id*. at 251.  Foley then testified as follows:

> Q:     All right. When you get to that front door, do you check him in terms of his appearance in terms of your police thinking pattern?  Are you looking for anything?
>
> A:     Yes.
>
> Q:     All right.  So what are you looking for?
>
> A:     I looked for any evidence that lets you know that he was outside.

---

[2]        Respondent does not argue that any of Monroe's claims are either unexhausted or procedurally defaulted.

Q:      What do you see?

A:      The bottom back part of his pants were wet.

Q:      Okay.  In your experience as a police lieutenant of – how many years experience?

A:      15 years.

Q:      He had just told you he had not been outside, right?

A:      That's correct.

Q:      You saw something that in your mind did what to that statement?

        Mr. Martin:     Objection.

        The Court:      Overruled.

A:      He lied.  He hadn't –

        Mr. Martin:     Objection.

        Mr. Cafferkey: Objection, objection.

Q:      At that moment did you believe his statement based on the visual observation of the wetness on the hem of his pants?

A:      No, I did not.

(Doc. No. 9-5 at 253; Doc. No. 9-6 at 4.)  Foley went on to testify that, based on his belief that Monroe had been untruthful, he presented Monroe to an eyewitness (Milton Caraballo) for a "cold-stand" identification.  (Doc. No. 9-6 at 4-7).  He further testified Mr. Caraballo was unable to identify Monroe as the shooter and Monroe was "let go on his way."  *Id*. at 6-7.

On direct appeal, Monroe argued Foley's testimony was an improper comment on his credibility that invaded the province of the jury and entitled him to a new trial. The state appellate court considered this claim on the merits and rejected it as follows:

-15-

Defendant relies on case law that holds it is improper for a witness to vouch for the credibility of another witness. *State v. Young*, Cuyahoga App. No. 79243, 2002-Ohio-2744 (holding that it was plain error when a detective testified that a witness was "telling the truth.") This court has held that an officer is not vouching for a witnesses [sic] credibility by explaining the investigative procedure he followed and, therefore, the testimony is "admitted for proper purposes." *See State v. Vales*, Cuyahoga App. No. 81788, 2003-Ohio-6631, ¶ 33, citing, *In re: Shubutidze* (Mar. 8, 2001), Cuyahoga App. No. 77879, *see, also*, *State v. Axson*, Cuyahoga App. No. 81231, 2003-Ohio-2182, ¶ 67.

In this case, Lt. Foley's testimony was directed to defendant's single comment that he had not been outside that was reasonably inconsistent with the wet cuffs that Lt. Foley observed on defendant's pants. This limited testimony did not invade the province of the jury. Lt. Foley's comments were offered merely to explain why he decided to present defendant to the eyewitness for a potential identification. Notably, Lt. Foley and Officer Wagner told the jury that the eyewitness was unable to positively identify defendant as the shooter and, therefore, defendant was released. Defendant maintains that the trial court also erred by allowing Det. Everett to testify that his investigation led him to the conclusion that six to eight unidentified black males allegedly observed by Crystal Demopoulos "had no role in the crime that occurred" or the shooting. Defendant offers no case law in support of why the admission of this testimony was error and we find none.

This assignment of error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 5 (Ohio App. 8ᵗʰ Dist. June 23, 2011). *See also* Doc. No. 9-1, Exh. 24 at 11-12.

Monroe argues the state appellate court's resolution of this claim "represented unreasonable application of the facts." (Doc. No. 10 at 13.) He claims the trial court should have given a limiting instruction and that Lieutenant Foley's testimony invaded the province of the jury to render credibility determinations. (Doc. No. 10 at 13.)

Respondent argues Lieutenant Foley's testimony was proper because it was necessary to chronologically explain his investigative actions and pertained only to what occurred at the crime scene. He asserts "[t]he jury had enough evidence just from the police officer's testimony

-16-

regarding his observations that the jury could readily formulate their own belief as to whether

Monroe was truthful on the night of the crime." (Doc. No. 9 at 16.)  Moreover, even if it was error

to admit Lieutenant Foley's testimony, Respondent argues such error was harmless given Foley's

subsequent testimony that, after viewing the "cold stand" identification, Mr. Caraballo was unable

to identify Monroe as the shooter . (Doc. No. 9 at 16.)

In conducting habeas review, "a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62,

68 (1991).  As such, the Supreme Court has explained that  "it is not the province of a federal

habeas court to reexamine state-court decisions on state-law questions." *Id*. at 67-68.  *See also*

*Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.

2001).  Accordingly, "errors in application of state law, especially with regard to the admissibility

of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959,

962 (6th Cir. 1983).  *See also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Bey,* 500 F.3d at

519; *Coleman*, 244 F.3d at 542.

However, "[w]hen an evidentiary ruling is so egregious that it results in a denial of

fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d

at 512.  *See also Coleman,* 244 F.3d at 542; *Burger v. Woods*, 2013 WL 613382 at * 2 (6th Cir.

Feb. 20, 2013).  The Sixth Circuit has cautioned that "courts 'have defined the category of

infractions that violate 'fundamental fairness' very narrowly." *Bugh*, 329 F.3d at 512 (citations

omitted).  *See also Dowling v. United States*, 493 U.S. 342, 352-53 (1990); *Burger*, 2013 WL

613382 at * 2 ("A due process claim premised on a mistaken state court evidentiary ruling faces a

steep climb.").  "Generally, state-court evidentiary rulings cannot rise to the level of due process

violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  In order to obtain habeas relief in this context, a petitioner must establish "actual prejudice" from the admission of the allegedly improper evidence. *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994).  *See also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (petitioner must show that admission of improper evidence is "material in the sense of a crucial, critical highly significant factor"); *Brown*, 2013 WL 613382 at * 3 (same).

In the instant case, the Court finds the state appellate court's resolution of this claim was not unreasonable.  As noted above, the question here is not whether Lieutenant Foley's testimony was properly admitted as a matter of state law, but whether his testimony was so prejudicial that its introduction was "fundamentally unfair."  The Court finds that it was not.  Defendant had the opportunity to, and did, cross-examine Lieutenant Foley regarding his testimony. (Doc. No. 9-6 at 11-14.)  Further, as the state appellate court emphasized, the purpose of Foley's testimony was to explain why he decided to present Monroe to Caraballo for a cold-stand identification.  However, Foley then testified (on both direct and cross examination) that Caraballo was not able to identify Monroe as the shooter and, as a result, Monroe was "let go on his way." (Doc. No. 9-6 at 6-7, 13-14.)  The state court was not unreasonable in determining that any potentially prejudicial effect of Foley's characterization of Monroe's truthfulness was mitigated by Foley's subsequent testimony that Caraballo was unable to make a positive identification.

Moreover, after reciting a number of factors to be considered in determining a witness' credibility, the trial court clearly instructed the jury that "you assign to the testimony of each

witness the weight which you determine to be proper" and "you are not required to believe the testimony of any witness simply because he or she was under oath." (Doc. No. 9-6 at 1186.) Such jury instructions have been found, under similar circumstances, to mitigate prejudice stemming from improper remarks or testimony. *See e.g. Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000) (finding credibility instruction helped to cure prejudice when prosecutor improperly vouched for truthfulness of a witness); *Sok v. Romanowski*, 619 F.Supp.2d 334, 359 (W.D. Mich. 2008) (same).

In light of the above, the Court finds Monroe was not deprived of a fair trial as a result of Lieutenant Foley's testimony that he believed Monroe was untruthful when questioned on the night of the shooting. Other federal courts in this Circuit faced with similar arguments have reached the same conclusion. *See e.g. Young v. Rapelje*, 2012 WL 368646 at * 5 (E.D. Mich. Jan. 4, 2012) *adopted by* 2012 WL 368225 (E.D. Mich. Feb. 3, 2012) (finding habeas relief was not warranted where police officer testified regarding petitioner's lack of truthfulness).

Monroe also argues, summarily, that he was denied a fair trial by the testimony of Detective Everett indicating he did not believe a group of unidentified black males played a role in the shooting of David Bober. (Doc. No. 10 at 13.) Monroe fails to explain the basis for this argument. He provides no substantive discussion of this issue and cites no case law suggesting the admission of Detective Everett's testimony constituted error of constitutional magnitude. In the absence of any meaningful argument, and upon its own review of the record, the Court finds the admission of Detective Everett's testimony did not deprive Monroe of a fair trial.

Accordingly, the Court finds Monroe's First Ground for Relief is without merit.

**2.     Ground Two**

-19-

In his Second Ground for Relief, Monroe argues the trial court violated his right to confrontation and cross-examination when it allowed Lieutenant Foley to testify that he (1) received information directing him to Monroe's residence; (2) observed people in the windows of a neighboring residence; and (3) encountered and spoke to a black female when he knocked on Monroe's door on the night of the shooting. (Doc. No. 10 at 14-16.)

During trial, Lieutenant Foley testified he arrived at the crime scene and canvassed the street from the vicinity of Mr. Bober's residence at 3304 West 48th Street, proceeding north for approximately 50 yards.  (Doc. No. 9-5 at 225.)   In so doing, Foley testified he passed Monroe's residence (located at the rear of 3289 West 48th Street) and "kept going at least two or three more houses." *Id.* at 226.  He testified he was then "directed to" the specific area of Monroe's residence.  *Id*. at 227.  Defense counsel objected and Foley testified as follows:

> Q:  Was this all one sequence of events? I mean, were you — eventually you walked to the rear home on 3289 for some reason, correct?
>
> A:  That's correct.
>
> Q:  Was that continuous in terms of – what you just described where you're walking the driveway looking for casings, did you then leave the driveway, go up and come back; or was this all one event where you're looking for casings and then go to the rear?
>
> A:   I was walking the street, and I received information and I – that's what directed me to that area.
>
> Q:  Okay.  Was this information– this is a yes or no question.  Was this information from a police officer?
>
>     MR. CAFFERKEY:   Objection.
>
>     MR. MARTIN:        Objection.
>
> A:  No.

MR. THOMAS:          Judge, time to approach.

THE COURT:          Yeah, please.

(Thereupon, a discussion was had between the Court and counsel at sidebar.)

THE COURT:          That objection is sustained, move on.

Q:      Lieutenant, this question does not call for any verbal information on your part.  I want to know what your eyes saw, all right. When you were walking the driveway of 3289, when you're in the vicinity of the front home, do you observe any civilians?

A:      No, not that I recall.

Q:      At any point do you look at the windows of the surrounding homes?

MR. MARTIN:          Objection. Objection. Can we approach?

THE COURT:          No, overruled.  You may answer.

A:      Yes.

Q:      All right. When you looked at the windows of the surrounding homes, do you see any —

MR. MARTIN:          Continuing objection, your Honor.

Q:      – people?

A:      Yes.

* * *

Q:      Okay. What floor or level of the home are they on?

A:      On the upper level.

Q:      Okay.  How many individuals do you see?

A:      Approximately three.

Q:      Okay.  Again, this is a nonverbal question.  When you see them,

what are they doing?

MR. MARTIN:          Objection, Your Honor. May we approach?

*Id*. at 227-231.

At this point, the jury was excused and the Court conducted an extensive discussion with counsel.  *Id*. at 231- 247.  Outside the presence of the jury, Foley explained that the individuals in the window pointed and gestured towards Monroe's residence and stated to Foley that "[t]he guy you're looking for was . . . right next door."  *Id*. at 233- 34.  He further stated it was because of this communication that he went to Monroe's residence.  *Id*. at 234-35.  After listening to the parties' arguments, the trial court determined Foley would be permitted to testify that he observed the three people hanging out of the window.  *Id.* at 239-241.  Defense counsel agreed this testimony would not constitute hearsay.  *Id*. at 240.  However, the trial court indicated Foley would not be permitted to testify that these individuals pointed, gestured, and spoke to him. *Id*. at 240-242.

The court also heard arguments regarding Foley's anticipated testimony that, when he knocked on Monroe's door, a black female (later identified as Sonya Byrd) opened it and spoke with Lieutenant Foley.  *Id*. at 216-220, 243- 247.  Defense counsel explained that, although Ms. Byrd was on their witness list, they had been unable to locate her.  *Id*. at 219.  The trial court ruled Lieutenant Foley could testify that Ms. Byrd answered the door, but could not testify regarding anything she said to him. *Id*. at 243-247.

The jury was then brought back to the courtroom and Foley testified in accordance with the trial court's instructions.  Specifically, he testified he saw people "hanging out" of the window and then went to Monroe's residence.  *Id*. at 248.  He then testified that when he knocked on

Monroe's door, it was answered by a black female.  *Id.* at 249.  He described his interaction with

her as follows:

> Q:    Okay. Now, I want your words only on this next question.  What did
>        you say to her?
>
> A:    I said, Did somebody just come in the house?
>
> Q:    And the following question is a yes or no answer; do you
>        understand?
>
> A:    Yes.
>
> Q:    Did she respond back to your question?
>
> A:    Yes.
>
> Q:    What did you then say in turn?
>
> A:    Is there somebody else in the house with you.
>
> Q:    And does she – yes or no– respond to that statement by you?
>
> A:    Yes, she does.
>
> Q:    What do you then say back to her for your third statement?
>
> A:    Could you have him come out?
>
> Q:    And yes or no; does she respond to that request by you?
>
> A:    Yes, she does.
>
> * * *
>
> Q:    And what happens?
>
> A:    A gentleman walked out.

*Id.* at 249-250.

On direct appeal, Monroe argued Foley's testimony, regarding both the individuals in the

-23-

window and the black female who answered Monroe's door, violated his right of confrontation and cross-examination.  The state appellate court rejected this argument as follows:

> Defendant maintains the comments amounted to testimony of "nonverbal conduct" and therefore qualified as inadmissible hearsay statements and the admission of that testimony violated his right to confrontation.

> As set forth above, the trial court held an extensive hearing on the scope of Lt. Foley's testimony and sustained defendant's objections to testimony concerning any verbal statements and nonverbal conduct made by non-testifying witnesses.  Defense counsel agreed that Lt. Foley's testimony that he saw people in a window would not qualify as hearsay.  Lt. Foley's testimony to the jury was limited to saying that he saw people in a window and then he went to the rear residence of 3289 W. 48th Street.  This testimony did not describe any nonverbal conduct that could be construed as an assertion being offered to prove the truth of the matter.

> Likewise, the trial court instructed Lt. Foley that he could not testify as to anything said by the female who answered the door of defendant's residence. And, he did not. Instead, Lt. Foley testified that he asked specific questions to the female, received responses (but did not provide the substance of the response) that prompted further action by him.  This testimony does not include a description of any verbal or nonverbal conduct that could be construed or intended as an assertion by the woman who answered the door.

> While the trial court sustained defendant's objection and excluded testimony of nonverbal conduct and statements of non-testifying witnesses, it did allow Lt. Foley to explain his conduct during the investigation.  "[W]here statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay." *State v. Blevins* (1987), 36 Ohio App.3d 147, 149, 521 N.E.2d 1105, citing, *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401.  The court in *Blevins* went on to hold that: "In order to admit out-of-court statements which explain an officer's conduct during the course of a criminal investigation, the conduct to be explained must be relevant, equivocal and contemporaneous with the statements.  In addition, the statements must meet the standard of Evid. R. 403(A)."  *Id*. at paragraph one of the syllabus.  This court applied these conditions in *State v. Seward*, Cuyahoga App. No. 80993, 2003-Ohio-1337, ¶ 27-28.

> Assuming any of Lt. Foley's testimony could be construed to include any out-of-court statements, whether verbal or nonverbal, his testimony was

appropriately limited under the above-cited conditions.  He limited his testimony to relevant and contemporaneous events that served to explain his conduct during the investigation.  Further, the probative value of the identified portions of his testimony was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury as proscribed by Evid. R. 403(A).  This assignment of error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 6.

In his habeas petition, Monroe maintains the state appellate court's decision was unreasonable because Foley's testimony was "in effect, non-verbal information which was intended to be an assertion." (Doc. No. 10 at 14.)  He claims that, allowing Foley to testify to what he observed and what he then did, "constituted an end run around the hearsay objection." *Id.* at 15.  Monroe argues the trial court should have given a limiting instruction, explaining that Foley's testimony should be considered only to the extent it described his investigation of the crime scene.  Having failed to do so, the jury had this evidence "to consider for whatever purpose it believed was proper."  *Id.* at 15.  Monroe argues this violates his right to confrontation as set forth in the Sixth Amendment and explained in *Crawford v. Washington*, 541 U.S. 36 (2004).

Respondent cites Sixth Circuit case law for the proposition that, even if an out of court statement is testimonial, it is not inadmissible hearsay if it is allowed to explain the course of a police investigation and not for the truth of the matter asserted.  *See e.g. U.S. v. Davis*, 577 F.3d 660, 666-67 (6th Cir. 2009).  Under this precedent, Respondent argues Foley's testimony was properly admitted because it was carefully limited to explain his investigation.  He also maintains generally that Foley's testimony did not render Monroe's trial "fundamentally unfair."

The Confrontation Clause of the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him."  U.S. CONST., AMEND. VI.  This guarantee applies to both federal and state prosecutions. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965).  The Confrontation Clause bars the admission of "testimonial statements" offered to establish the truth of the matter asserted where the defendant has not had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004); *United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004).  "Only [testimonial] statements ... cause the declarant to be a 'witness' within the meaning of the Confrontation Clause [and] [i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  *Davis v. Washington*, 547 U.S. 813, 821 (2006).

The Sixth Circuit has held that "[s]tatements 'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address."  *United States v. Cromer*, 389 F.3d 662, 674 (6th Cir. 2004) (citations omitted).  In determining whether a statement is testimonial, "[t]he proper inquiry . . . is whether the declarant intends to bear testimony against the accused.  That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."  *Id*. at 675.  *See also United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011).

That being said, the admission of a testimonial statement "does not necessarily trigger a violation of the Confrontation Clause."  *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007)(quoting *United States v. Pugh*, 405 F.3d 390, 399 (6th Cir. 2005)).  Instead, to constitute a Confrontation Clause violation, "the statement must be used as hearsay – in other words, it must

-26-

be offered for the truth of the matter asserted." *Id.* *See also United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009). In some circumstances, out-of-court statements not offered for the truth of the matter asserted, but for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay. *See Davis*, 577 F.3d at 666; *Gibbs*, 506 F.3d at 486-87). *See also Cromer*, 389 F.3d at 676 ("[e]ven if testimonial statements of an out-of-court declarant were revealed by this testimony, Cromer's confrontation right was not implicated because the testimony was provided merely by way of background"); *United States v. Martin*, 897 F.2d 1368, 1371-72 (6th Cir. 1990) (finding Confrontation Clause not implicated where assertions not offered for their content, but merely to explain why government commenced investigation).

In the instant case, the Court finds the state appellate court's resolution of this claim was not contrary to or an unreasonable determination of either the facts or clearly established federal law.[3] With respect to the individuals in the window, Foley testified he observed three individuals "hanging out of a window" on West 48th Street and "received information" that "directed him to"

---

[3]    Although the state appellate court did not expressly address Monroe's argument that the admission of Foley's testimony violated his federal constitutional rights under *Crawford*, this Court must nevertheless accord AEDPA deference to the state court's decision. In *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (Feb. 20, 2013), the Supreme Court recently explained that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits" and, therefore, apply AEDPA deference under § 2254(d). *See also Moreland v. Bradshaw*, 699 F.3d 908, 922 (6th Cir. 2012)(in pre-*Johnson* decision, noting that AEDPA deference appears to be required "where a federal issue has been raised but the state court denied the claim with a discussion solely of state law"). While this presumption is rebuttable "in some limited circumstances," *Johnson*, 133 S.Ct. at 1096, the Court does not find such circumstances present here. Indeed, Monroe does not argue that this Court should conduct a *de novo* review of this claim. Moreover, even if the Court were to consider this claim *de novo*, it would lack merit for the reasons set forth above.

Monroe's residence.  Foley did not provide any testimony regarding the specific nature or content of the information received.  He was not permitted to testify that these individuals were "pointing and gesturing" towards Monroe's residence, nor was he permitted to testify regarding any statements made by these individuals to him about Monroe.

As an initial matter, it is not clear that Foley's testimony describes a "testimonial statement," since he was not permitted to testify that these individuals pointed, gestured, or spoke to him.  However, even assuming Foley's description of his interaction with these individuals constituted a nonverbal "testimonial statement," the Court finds the state appellate court was not unreasonable in determining Monroe had failed to demonstrate a violation of his right of confrontation.  Foley's testimony was not asserted to prove the truth of the information that these unidentified individuals apparently conveyed to him, i.e. that Monroe was involved in the shooting.  Rather, it was limited to explaining to the jury why, after he had already canvassed the area in the immediate vicinity of Monroe's residence and moved down the street, Foley doubled back and proceeded up Monroe's driveway directly to his residence located at the rear of 3289 W. 48th Street.  As Foley's testimony was focused on explaining the course of his investigation, the state court reasonably determined that his testimony was not offered to assert the truth of the information conveyed by the individuals in the window and, therefore, did not implicate Monroe's right of confrontation. *See e.g. Cromer*, 389 F.3d at 676;. *Martin*, 897 F.2d at 1371-72.

With respect to Foley's testimony regarding his interaction with Ms. Byrd, Monroe's argument is even more tenuous.  While Foley testified that Ms. Byrd answered the door at Monroe's residence and responded to several specific questions, he was not permitted to testify regarding anything Ms. Byrd said to him. (Doc. No. 9-5 at 249-50).  Given the fact Foley did not

-28-

testify to anything other than what he said and observed, the Court finds his description of the interaction with Ms. Byrd does not constitute hearsay. Moreover, even if the Court were to assume Foley's testimony encompassed a "testimonial statement" of Ms. Byrd, the Court finds the state appellate court was not unreasonable in determining his testimony was appropriately limited to describing the course of his police investigation and, therefore, did not implicate his right of confrontation. *See e.g. Cromer*, 389 F.3d at 676; *Martin*, 897 F.2d at 1371-72.

Accordingly, and for all the reasons set forth above, the Court finds Monroe's Second Ground for Relief is without merit.

### 3.      Ground Three

In his Third Ground for Relief, Monroe argues the trial court erred when it permitted witness Dan Smith to read his entire police statement to the jury as part of the State's re-direct examination. (Doc. No. 10 at 16-18). He asserts, summarily, that this was "improper and prejudicial and denied petitioner a fair trial." *Id*. at 17.

At trial, Dan Smith testified that he lived in the "front house" of 3289 West 48th Street, while Monroe lived in the "back house" of that same property. On the night of the shooting, he heard arguing and raised voices, looked out his window, and saw Monroe dressed in dark clothes talking on a cell phone. He testified he then saw Monroe fire a gun towards a group of three or four white people across the street. Smith testified he heard Monroe "nonchalantly" say, "I just had to shoot this guy." (Doc. No. 9-4 at 204, 209-214).

During cross-examination, defense counsel questioned Smith regarding a statement he made to the police the morning after the shooting. In particular, counsel sought to highlight alleged inconsistencies between Smith's statement and his trial testimony regarding whether or

-29-

not Smith had seen people in the street on the night of the shooting. (Doc. No. 9-5 at 21-23). On re-direct, the State sought to rehabilitate Mr. Smith by having him read, verbatim, his entire statement. (Doc. No. 9-5 at 23-26). Defense counsel noted an objection, which was overruled. (Doc. No. 9-5 at 25).

On direct appeal, Monroe argued that allowing Smith to read his entire statement deprived him of a fair trial. The state appellate court considered this claim on the merits and rejected it as follows:

> Under cross-examination, Dan Smith was questioned about the statement he made to police. Defense counsel read certain excerpts from Dan's statement to the police, including his description of the suspect's height and weight. Counsel also questioned Dan as to what he told police concerning his observations of people in the street, which was inconsistent with what he testified to at trial. On re-direct, the state had Dan read the entire statement into the record.
>
> This court has held, "[w]here a portion of a witness' previous statement is introduced to illustrate an inconsistency with his present testimony, the entire statement is admissible in rebuttal." *Shellock v. Klempay Bros.* (1958), 167 Ohio St. 279, at 282. [footnote omitted]. This court acknowledged the state's right to use the entire document to rehabilitate a witness in *State v. Ciasullo* (Jan. 21, 1981), Cuyahoga App. Nos. 42702 and 43172, unreported, at 12-13. *See, also, Motorists Mut. Ins. Co. v. Vance* (1985), 21 Ohio App.3d 205, 207; *State v. Sprawl* (1982), 3 Ohio App.3d 406, 407; *Ketterer v. Red Star Transit Co.* (1956), 78 Ohio Law Abs. 123; *State v. Rivera* (Nov. 9, 1989), Cuyahoga Appl No. 56158; *see, also, State v. Harvey* (Mar. 6, 1975), Cuyahoga App. No. 33157 (admission of parts of statement that are irrelevant or material to explanation of apparent inconsistencies is harmless error and not grounds for reversal where the record contains substantial evidence that supports the guilty verdict against the appellant.)
>
> Defendant generally asserts that he was prejudiced and denied a fair trial when Dan's entire statement was read into the record on re-direct. However, defendant does not set forth any substantive argument as to how he was prejudiced by its admission nor does he point to any portions that were irrelevant or immaterial to explain the apparent inconsistencies the defense raised on cross-examination between Dan's statement to police

> and his trial testimony.  Finally, there is substantial evidence in the record
> that supports the guilty verdict against defendant.  Accordingly, this
> assignment or error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 7.

Monroe argues the trial court erred by allowing Smith to read his entire police statement to the jury because it was an improper attempt to bolster Smith's credibility.  He asserts that Smith's police statement was not admissible under Ohio Evid. R. 801(D)(1)(b) and its admission was prejudicial, depriving him of a fair trial.

Respondent argues this claim is entirely a matter of state law and, therefore, not cognizable on habeas review.  He further argues Monroe was not deprived of a fair trial since Dan Smith testified and was available for cross-examination regarding all aspects of his prior police statement.  Indeed, Respondent notes defense counsel "thoroughly cross-examined Dan Smith. . . , specifically questioned Smith about alleged inconsistencies in his prior written statement to the police, and had Smith read portions of the statement while testifying." (Doc. No. 9 at 21-22).  Under these circumstances, Respondent maintains, it was not "fundamentally unfair" to allow the State to use Smith's entire statement to rehabilitate him on re-direct examination.

The Court agrees.  Although Monroe asserts summarily that "[t]his was not merely an issue of state law," he fails to explain how allowing Smith to read his entire police statement violated Monroe's federal constitutional rights.  In the absence of any meaningful argument suggesting otherwise, the Court finds this Ground for Relief states a purely state law issue that is not cognizable in habeas.  As such, Monroe is only entitled to relief if the trial court's evidentiary ruling on this issue "is so egregious that it results in a denial of fundamental

-31-

fairness." *Bugh*, 329 F.3d at 512.  *See also Seymour*, 224 F.3d at 552 ("[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.")(quoting *Egelhoff*, 518 U.S. at 43).

Monroe has failed to demonstrate Smith's testimony rises to the level of a due process violation.  As noted by Respondent, Smith was available for cross-examination and was, in fact, thoroughly questioned by defense counsel regarding the contents of his police statement. Monroe has failed to articulate how he was prejudiced by the admission of this testimony, nor does he explain how it denied him a fundamentally fair trial.  Upon careful review of Smith's entire trial testimony, the Court finds the admission of his prior police statement did not deprive Monroe of a fair trial.

Accordingly, Monroe's Third Ground for Relief is without merit.

**4.      Ground Four**

In his Fourth Ground for Relief, Monroe argues he was denied his right of confrontation and cross-examination when the trial court permitted a non-examining coroner, Dr. Frank Miller, to testify as to the cause and manner of death by reading from an autopsy report prepared by a different coroner who did not testify.  He also argues this error was compounded by the trial court's classification of Dr. Miller as an expert witness in the presence of the jury.

At trial, Dr. Miller testified he was the appointed coroner for Cuyahoga County from August 2007 until December 31, 2008, and then served as the elected coroner beginning January 1, 2009. (Doc.No. 9-3 at 244.)  He described his job responsibilities and experience as coroner, noting he had testified over 100 times.  *Id*. at 245- 255.  At the State's request, the trial court

-32-

classified Dr. Miller as an expert.  (Doc. No. 9-4 at 5.)  Defense counsel did not object.  *Id.*

Dr. Miller then explained that David Bober's autopsy was performed by a fellow,[4] Dr. Emanuel Danaichew, who was supervised by staff pathologist Dr. Daren Trelka.  (Doc. 9-4 at 6-7.)  Dr. Miller further explained that neither Dr. Danaichew or Dr. Trelka were currently employed by the Cuyahoga County Coroner's Office.  *Id.* at 7-8.  Dr. Miller testified that he did not personally conduct the autopsy or view Mr. Bober's body.  *Id.* at 8.  However, he noted that, once Dr. Danaichew finished the autopsy report and Dr. Trelka approved it, it was brought to Dr. Miller for his review and counter-signature.  *Id.*  Dr. Miller also noted that he had reviewed the autopsy report and agreed with Dr. Danaichew's findings and conclusions.  *Id.* at 8-9.  Defendant raised a continuing objection to this line of testimony. (Doc. No. 9-3 at 235-241, Doc. No. 9-4 at 6-7.)

Dr. Miller then testified the approximate time of Mr. Bober's injury was 4:20 a.m. and he was pronounced dead at 4:49 a.m. on December 22, 2007.  *Id.* at 11.  He testified the manner of Mr. Bober's death was homicide, and the cause of death was gunshot wounds to the trunk and lower left extremity.  *Id.* at 12, 35.  He described in some detail the two gunshot wounds sustained by Mr. Bober, explaining the location of these wounds (i.e. his left thigh and trunk) and path the bullets took through Bober's body.  *Id.* at 13 - 19.  As to both wounds, Dr. Miller testified that the bullets proceeded through Mr. Bober's body from "back to front" and noted this

---

[4]    Dr. Miller explained that a "fellow" is a "fully trained pathologist who's had a minimum of four years of residency after medical school [and] has chosen to subspecialize in forensic pathology."  (Doc. No. 9-4 at 6).  He stated that fellows come to the Cuyahoga County Coroner's Office for one year of training after they have completed their medical residencies and are fully qualified pathologists.  *Id.* at 7.

-33-

was "consistent with a bullet coming at him from somewhere behind him." *Id.* at 15, 23-24.

Dr. Miller then authenticated the autopsy protocol, toxicology report, and photos from Mr. Bober's autopsy. *Id*. at 19-21. With regard to the toxicology report, Dr. Miller testified Mr. Bober's blood alcohol content level was .19, over twice the legal limit. *Id*. at 24-25. He also testified to the presence of "cocaine byproduct" in Mr. Bober's bloodstream, and explained it indicated cocaine consumption in the last one to three days, but not in his last six to twelve hours of life. *Id*. at 27. On cross-examination, defense counsel confirmed that Dr. Miller was not personally present at Mr. Bober's autopsy. *Id*. at 36-37.

On direct appeal, Monroe challenged the trial court's classification of Dr. Miller as an expert in the presence of the jury and argued Miller's testimony violated his constitutional right of confrontation. The state appellate court considered these arguments on the merits and rejected them as follows:

> Defendant's contention that it was error to qualify Dr. Frank Miller as an expert is unsupported by the record or the law. Evid. R. 702 sets forth the instances in which a witness may be qualified as an expert, including that a person may be qualified as an expert witness if the proponent of such witness can establish that the witness has knowledge of scientific, technical, or other such specialized nature. See Evid. R. 702. The record amply reflects Dr. Miller possessed such knowledge.

> Defendant relies on *United States v. Johnson* (6th Cir. 2007), 488 F.3d 690, in arguing the court erred by identifying Dr. Miller as an expert in front of the jury. However, in *Johnson*, the Sixth Circuit upheld the trial court's classification of a police officer as an expert. Although the court in *Johnson* did indicate a preference that the trial courts [sic] refrain from advising the jury of a qualified witness's designation as an expert, it determined that the trial court had not committed plain error by doing so. In this case, the defense did not object to Dr. Miller's qualifications as an expert, the record supports his qualifications as an expert, and the court's recognition of his expert qualification before the jury was not plain error.

> Defendant next asserts that the admission of Dr. Miller's testimony

-34-

violated his right of confrontation and cross-examination based on the Supreme Court precedent of *Melendez-Diaz v. Massachusetts* (2009), ---- U.S. ----, 129 S.Ct. 2527, 174 L.Ed.2d 314.

In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court determined it is error to admit a witness's testimony against a defendant unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. *Id.* at 54. Subsequently, the Court held in *Melendez-Diaz*, that it also violated the right to confrontation where a lab analyst's notarized certificates [FN 4] were admitted without affording the defendant an opportunity to cross-examine the lab analyst.

FN 4: The certificates indicated the substance was cocaine and set forth the weight of the cocaine at issue in that prosecution.

In *Melendez-Diaz*, the Supreme Court held that the certificates were testimonial in nature because they were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 129 S.Ct. at 2539, quoting, *Crawford*, 541 U.S. at 52. The Court further held that the certificates did "not qualify as traditional official or business records." *Id.* at 2538. The Court reasoned that, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial – they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here– prepared specifically for use at petitioner's trial – were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment." *Id.* at 2539.

After *Crawford* was decided, the Ohio Supreme Court addressed the exact issue that defendant is presenting now. That is, whether it violated the appellant's right to confrontation when the trial court allowed the Summit County medical examiner at the time of the trial, Dr. Kohler, to testify about the decedent's autopsy even though a different doctor had conducted the autopsy. *State v. Craig*, 110 Ohio St.3d 306, 2006- Ohio-4571, 853 N.E.2d 621. The court held that "under *Crawford* * * * autopsy reports are admissible as nontestimonial business records." The court went on to "conclude that Dr. Kohler's expert testimony about the autopsy findings, the test results, and her opinion about the cause of death did not violate Craig's confrontation rights." *Craig*, 2006-Ohio- 4571, ¶ 88. This is not in conflict with *Melendez-Diaz* because unlike the lab certificate at

issue in that case, which were prepared solely for use at trial, the autopsy report was non-testimonial.

In this case the defendant was not contesting the conclusions or opinions of the autopsy report and the findings were not central to the determination of criminal agency. No one disputed that David Bober's death was a homicide caused by a fatal gunshot wound or that he was intoxicated on the night in question; which was essentially the substance of the coroner's testimony in this case. Accordingly, defendant's Sixth Amendment right to confrontation was not implicated or violated by the admission of Dr. Miller's testimony.

*State v. Monroe*, 2011 WL 2476280 at * 8-9.

Monroe argues the state appellate court misapplied *Melendez-Diaz* in finding the autopsy report at issue was non-testimonial. He also argues the state court's rejection of this claim is contrary to recent Supreme Court decisions in *Williams v. Illinois*, 132 S.Ct. 2221 (2012) and *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011). Finally, relying on *United States v. Johnson*, 488 F.3d 690 (6th Cir. 2007), he maintains the state court erred in rejecting his claim of reversible error based on the trial court's classification of Dr. Miller as an expert.

Respondent argues the *Williams* and *Bullcoming* decisions support the state appellate court's decision that Bober's autopsy report was non-testimonial in nature. He emphasizes that the Coroner has a statutory duty to determine the cause and manner of death pursuant to Ohio Rev. Code §§ 313.09 and 313.19, and argues the Coroner's "findings are not to purposefully incriminate a particularized individual." (Doc. No. 9 at 27.) Moreover, Respondent notes Dr. Miller was subject to cross-examination and had, in fact, authored "at least a portion" of the report. Finally, even if error, Respondent argues the admission of Dr. Miller's testimony was harmless in light of the fact that "Monroe's defense was that he was not the killer; he did not contest the victim's death, cause of death, or manner of death." (Doc. No. 9 at 27.) Respondent

-36-

does not address Monroe's arguments regarding trial court error in classifying Dr. Miller as an expert.

The Court finds Monroe's argument that he is entitled to habeas relief because the trial court classified Dr. Miller as an expert in the presence of the jury without merit. As an initial matter, this claim is procedurally defaulted. As noted above, Monroe did not contemporaneously object to the trial court's alleged error, (Doc. No. 9-4 at 5), and the state appellate court reviewed the claim under a plain error analysis. *State v. Monroe*, 2011 WL 2476280 at * 8. The Sixth Circuit has held that such a plain error review by a state court does not constitute a waiver of procedural default rules. *See e.g. White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The Sixth Circuit has also held that Ohio's contemporaneous objection rule is an independent and adequate ground to foreclose relief absent a showing of cause and prejudice. *White*, 431 F.3d at 525. *See also Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). Thus, the Court finds this claim is procedurally defaulted and, further, finds no indication of cause or prejudice to excuse the default.

However, even if the Court were to review this claim on the merits,[5] it would be unavailing. While Monroe correctly notes that the Sixth Circuit criticized the practice of classifying a police officer as an expert in front of the jury in *Johnson*, the court in that case

---

[5]     As noted *supra*, Respondent does not argue that any of Monroe's claims are procedurally defaulted. The Sixth Circuit has recognized that a habeas court may *sua sponte* raise the issue of procedural default. *See e.g. Howard v. Bouchard*, 405 F.3d 459, 475 (6th Cir. 2005); *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000). However, as Monroe has not had the opportunity to specifically address this procedural issue, the Court will also address the merits of Monroe's claim.

nevertheless found no plain error from the district court's having done so.  *Johnson*, 488 F.3d at 698.  Moreover, in *Johnson*, the Sixth Circuit analyzed this issue on direct review from Johnson's conviction and sentence.  Monroe does not cite a single case in which a *habeas* court has found a state court determination of no plain error on this particular issue to be unreasonable or contrary to clearly established federal law.  Moreover, other than quoting at length from *Johnson*, Monroe provides no explanation as to how he, in particular, was prejudiced by the classification of Dr. Miller as an expert.  This omission is particularly problematic where, as discussed below, Dr. Miller's testimony regarding the cause and manner of death was not central to Monroe's defense at trial. Accordingly, the Court finds this argument to be without merit.

With respect to Monroe's claim that he is entitled to habeas relief because Dr. Miller's testimony violated his right of confrontation, the Court rejects this argument as well.  In affirming the admission of the autopsy report and Dr. Miller's testimony, the state appellate court relied on the Ohio Supreme Court's decision in *Craig*, which determined that an autopsy report is not a "testimonial" statement under *Crawford*.  The state appellate court then went on to find that *Craig* was "not in conflict with" the United States Supreme Court's subsequent decision in *Melendez-Diaz* because autopsy reports are not "prepared solely for use at trial" and are, therefore, non-testimonial.  *Monroe*, 2011 WL 2476280 at * 9.

The Court finds the state appellate court's decision was not an unreasonable application of clearly established federal law.   In *Melendez-Diaz*, the defendant was arrested along with two other men on suspicion of drug trafficking, and placed in a police cruiser.  During the drive to the police station, the officers observed the three men "fidgeting and making furtive movements in the back of the car." *Melendez-Diaz*, 557 U.S. at 308.  After arriving at the station, the officers

searched the cruiser and found a plastic bag containing 19 smaller plastic bags hidden in the partition between the front and back seats.  Melendez-Diaz was charged with distributing cocaine and with trafficking in cocaine in an amount between 14 and 28 grams.  At trial, the prosecution submitted three "certificates of analysis" showing the results of forensic testing performed on the seized substances.  "The certificates reported the weight of the seized bags and stated that the bags '[h]ave been examined with the following results: The substance was found to contain: Cocaine.'" *Id.*  The certificates were sworn to before a notary public by analysts at the state laboratory.  Neither the individuals who analyzed the seized substances, or anyone else from the state lab were called to testify at trial.

The Supreme Court determined that "[t]here is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements'" described in *Crawford.  Id.* at 310. The Court explained that the "certificates" were "quite plainly affidavits" made for the "purpose of establishing or proving some fact," i.e.  "that the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine – the precise testimony the analysts would be expected to provide if called at trial." *Id.*  Moreover, the Court noted that "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' *Crawford, supra*, at 52, 124 S.Ct. 1354, but under Massachusetts law the sole purpose of the affidavits was to provide '*prima facie* evidence of the composition, quality, and the net weight' of the analyzed substance."  *Id.* at 311.  Thus, the Supreme Court found the affidavits were testimonial statements and that, absent a showing of unavailability and a prior opportunity to cross-examine, Melendez-Diaz was "entitled to 'be confronted with' the analysts at trial."  *Id.*

The state appellate court's decision that the admission of Dr. Miller's testimony was not "in conflict with" *Melendez-Diaz* is not contrary to, or an unreasonable application of, clearly established federal law.  Dr. Miller testified that the Coroner's office is required by state law to produce a written report on any death it investigates (whether death by homicide or otherwise) and that those reports are "kept on file in our office in the ordinary course of business." (Doc. No. 9-3 at 251.)  In light of this testimony, it was not unreasonable for the state appellate court to conclude that Mr. Bober's autopsy report, and Dr. Miller's testimony regarding that report, were distinguishable from the certificates at issue in *Melendez-Diaz,* whose "sole purpose" was to provide "*prima facie* evidence" at trial.  Moreover, the state appellate court correctly noted that, unlike the certificates in *Melendez-Diaz* which were central to proving the specific drug charges against defendant therein, the manner and cause of David Bober's death were not contested at trial and the findings and conclusions set forth in the autopsy report were not "central to the determination of criminal agency." *Monroe*, 2011 WL 2476280 at * 9.  It was undisputed that David Bober's death was a homicide, that he was shot in the left leg and trunk from someone standing behind him, and that David Bober was intoxicated on the night of his death.  Indeed, this information was elicited in some detail during the testimony of both Raymond Bober and Milton Caraballo. (Doc. No. 9-3 at 175-177, 180, 189, 194, 207-209; Doc. No. 9-4 at 84-86.)

Monroe and Respondent devote much of their argument to the possible impact of the Supreme Court's decisions in *Bullcoming* and *Williams* on the state appellate court's resolution of this claim.  However, neither of these decisions were available to the state appellate court at

the time it issued its decision in this case.[6]  It is well-established that "[t]o analyze whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision." *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. Feb. 26, 2013).  *See also Mitchell v. Kelly*, 2013 WL 1197004 at * 1 (6th Cir. March 25, 2013).   As neither *Bullcoming* nor *Williams* were published at the time of the state appellate court's decision herein,[7] this Court need not decide whether either case clearly established that David Bober's autopsy report constitutes a "testimonial statement." *See Mitchell v. Kelly*, 2013 WL 1197004 at * 2 (limiting review of Confrontation Clause claim to Supreme Court precedent in existence at the time of the relevant state court decision).  *See also Vega v. Walsh*, 669 F.3d 123, 127-28 (2nd Cir. 2012); *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011); *McNeiece v. Lattimore*, 2012 WL 6757956 at * 1 (9th Cir. Dec. 18, 2012).

Accordingly, and in light of the above, the Court finds the state appellate court's decision that Dr. Miller's testimony did not violate Monroe's right of confrontation was not contrary to, or an unreasonable application, of  clearly established federal law.[8]

---

[6]     *Bullcoming* was decided on June 23, 2011, the very day the state appellate court issued its decision.  *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (June 23, 2011).  *Williams* was decided a year later, in June 2012.  *Williams v. Illinois*, 132 S.Ct. 2221 (June 18, 2012).

[7]     The state appellate court's decision is the relevant decision here because it was "the last state court adjudication on the merits of [this] claim." *Greene v. Fisher*, 132 S.Ct. 38, 45 (2011). As noted *supra*, although Monroe appealed the state appellate court ruling, the Ohio Supreme Court "denie[d] leave to appeal and dismiss[ed] the appeal as not involving any substantial constitutional question." (Doc. No. 9-1 at 394.)

[8]     Even if a Confrontation Clause violation had occurred, any error in the admission of Dr. Miller's testimony was harmless.  "An error is not harmless if it had a

-41-

### 5.     Ground Five

In his Fifth Ground for Relief, Monroe argues he was denied due process of law and the

right of confrontation when the trial court admitted 911 calls from a witness, Dennis Smith, who,

admittedly, did not personally witness what he reported during the call but related only what he

had been told by his son, Dan Smith. (Doc. No. 10 at 22-23.)

On direct appeal, the state appellate court considered this claim and rejected it as follows:

We review the admission of evidence, including 911 tapes, under the abuse
of discretion standard. *State v. Kinley* (1995), 72 Ohio St.3d 491, 497, 651
N.E.2d 419.

Defendant challenges the admission of the content of Dennis Smith's 911
calls, asserting they were inadmissible hearsay pursuant to Evid.R. 801(C).

Hearsay is "a statement, other than one made by the declarant while
testifying at the trial or hearing, offered in evidence to prove the truth of
the matter asserted." *Id.*

Dan testified at trial and explained his desire to remain anonymous and that
he did not want to be involved. He wanted, however, to notify police that
they were searching the wrong area. He called his dad who, in turn, called
911. Thereafter, the crime scene was expanded to include Dan's residence.

Dennis identified his voice on certain 911 tapes where he provided
information to assist the police during their contemporaneous investigation.
Dennis testified that his son Dan contacted him and said he had witnessed

---

'substantial and injurious effect or influence in determining the jury's verdict.'"
*Jordan v. Warden, Lebanon Correctional Inst.*, 675 F.3d 586, 598 (6th Cir. 2012)
(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Here, there is no
indication that Dr. Miller's testimony had a "substantial and injurious effect or
influence" on the jury's verdict. As noted above, the substance of Dr. Miller's
testimony was undisputed at trial; i.e. that David Bober's death was a homicide,
that he was shot in the left leg and trunk from someone standing behind him, and
that David Bober was intoxicated on the night of his death. Moreover, this
information was elicited from both Raymond Bober and Milton Caraballo. (Doc.
No. 9-3 at 175-177, 180, 189, 194, 207-209; Doc. No. 9-4 at 84-86.)

-42-

his neighbor shooting at people. Dennis made the 911 calls because he was in fear for his son's safety and because Dan indicated he did not want to be involved.

Both Dan and Dennis Smith were available, testified at trial, and were subjected to cross-examination. Dennis even admitted that he had falsely stated that he had witnessed the shooting in his initial call to 911.

When defendant raised an objection at trial to the admission of the 911 tapes made by Dennis, the court provided a limiting instruction. The jurors were told that the tapes were not being admitted to prove the truth of statements made on them but for a different purpose. As stated, it was even established that Dennis's statements were not true, specifically that he had witnessed the incident. Where the 911 tape is being offered for a reason other than to prove the truth of the matters asserted, it "does not meet the definition of 'hearsay' set forth in Evid.R. 801(C)." *Kinley*, 72 Ohio St.3d at 498.

Even if the admission of Dennis's 911 calls were considered improper, it was at most harmless error. Crim.R. 52(A). The content of the subject tapes was consistent with the trial testimony of Dennis and Dan Smith. This assignment of error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 9.

Monroe argues the state appellate court failed to recite to or rely on any federal case and, therefore, this Court should conduct a *de novo* review of this claim. He then maintains that, even though Dennis Smith was available for cross-examination, the fact remains that he was "not relating what he had seen . . . . he was only relating what someone else had seen" and, therefore, his testimony constitutes inadmissible hearsay.  (Doc. No. 10 at 23.)  He further argues the trial court's limiting instruction was improper because it failed to specify that the 911 calls were not being offered for the truth of the matter asserted.

Respondent argues the trial court's admission of the 911 tape is purely a matter of state law and Monroe is therefore entitled to relief only if its admission deprived him of a fundamentally fair trial.  Respondent also argues the admission of this evidence was not

fundamentally unfair since (1) both Dennis Smith and his son, Dan Smith, testified at trial and were available for cross-examination, and (2) the trial court gave an appropriate limiting instruction.  For this same reason, Respondent maintains Monroe's right to confrontation was not violated.

The Court need not decide whether to apply AEDPA deference or conduct a *de novo* review because, under either standard, Monroe's argument is without merit.  To the extent Monroe is arguing the trial court erred in admitting the 911 calls because they were based on improper hearsay, this argument is purely a state law issue that is not cognizable in habeas.  As such, Monroe is entitled to relief only if the trial court's evidentiary ruling "is so egregious that it results in a denial of fundamental fairness."  *Bugh*, 329 F.3d at 512.  The admission of Dennis Smith's 911 did not result in a denial of fundamental fairness.  Contrary to Monroe's assertion in his Traverse, the trial court did, in fact, expressly instruct the jury that Dennis Smith's 911 calls were not being admitted for "the truth of the matter asserted in this trial, but as an ability for . . . the witness to explain what he did." (Doc. No. 9-4 at 187-188.)  Moreover, as the state appellate court correctly noted, Dennis Smith was available for cross-examination and the circumstances of his 911 calls on the evening of December 22, 2007 were fully explained to the jury.  (Doc. No. 9-4 at 183 - 201.)  The admission of the 911 calls at issue did not violate Monroe's due process rights.

For similar reasons, the Court finds no violation of Monroe's right of confrontation.  Dennis Smith testified and was available for cross-examination, as was his son Dan Smith.  Both testified regarding the circumstances surrounding the 911 calls at issue.  Moreover, on both direct and cross, Dennis Smith fully explained to the jury that he had misrepresented himself to

-44-

the police during his first 911 call and had not, in fact, personally witnessed the events he described to the police dispatcher that night.  Further, the jury was expressly instructed that the 911 calls were not being offered for the truth of the matter asserted.  *See Gibbs*, 506 F.3d at 486 (to constitute a Confrontation Clause violation, "the statement must be used as hearsay– in other words, it must be offered for the truth of the matter asserted.").  Under these circumstances, the Court finds Monroe has failed to establish a violation of his right of confrontation.

Accordingly, and for all of the above reasons, the Court finds Monroe's Fifth Ground for Relief is without merit.

### 6.  Ground Six

In his Sixth Ground for Relief, Monroe argues he was denied due process when the trial court gave "conflicting and inconsistent instructions" concerning the elements of voluntary manslaughter.  He also alleges the trial court improperly instructed the jury regarding causation. (Doc. No. 10 at 23-27.)

### a.  Causation Instruction

In the context of instructing the jury on the murder charge, the trial court issued the following instruction regarding causation:

> Cause.  The State charges that the act or failure to act of the defendant caused death – caused the death, physical harm to David Bober.  Cause is an essential element of the offense of murder.  Cause is an act or failure to act which in a natural and continuous sequence directly produces death to David Bober and without which it would not have occurred.

> Natural consequences.  The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or the failure to act.

-45-

> Other causes is not a defense.  There may be one or more causes of an event.  However, if a defendant's act or failure to act was one cause then the existence of other causes is not a defense.
>
> Intervening causes.  The defendant is responsible for the natural consequences of the defendant's unlawful act or failure to act even though death to David Bober was also caused by the intervening act or failure to act of another person or agency.
>
> Independent intervening cause of death.  If the defendant inflicted an injury not likely to produce death and if the sole and only cause of death was a natural cause or a fatal injury inflicted by another person, the defendant who inflicted the original injury is not responsible for the death.

(Doc. No. 9-6 at 195-196.)

On direct appeal, the state appellate court rejected Monroe's argument that this instruction was improper.  The court first noted that Monroe had failed to object and, therefore, reviewed the instruction for plain error.  The court then concluded that "[t]he court's instructions at issue track the language employed in 4 Ohio Jury Instructions 2010.  Despite defendant's contentions to the contrary, the trial court's instructions on causation were a proper statement of the law."  *State v. Monroe*, 2011 WL 2476280 at * 11.  Thus, the court found Monroe had not established plain error and overruled his assignment of error on this issue. *Id.*

In his Traverse, Monroe argues this instruction was improper because it "was more akin to an instruction on negligence" and "[b]y this instruction defendant could be convicted even if the jury determined that the death was caused by another person." (Doc. No. 10 at 26.)  He further argues the word "cause" has a generally understood meaning and "did not require any expansive interpolation by the court." *Id.* at 27.  Finally, he maintains that, because the state court "merely ruled on state law," this issue "can be revisited by this court in *de novo* to consider the federal constitutional violations." *Id.* at 23.

-46-

Respondent maintains the state appellate court's determination was not unreasonable because (1) the causation instruction mimicked Ohio Jury Instructions 417.23 and 417.25; (2) instructions pertaining to intervening and other causes are explicitly allowed in homicide cases; and, (3) Monroe does not allege what alternative causation instruction should have been given nor has he established how the trial's outcome would have been different with an alternative instruction.  (Doc. No. 9 at 34-35.)

In order to warrant habeas relief, a petitioner must demonstrate that the jury instructions were *both* erroneous and, taken as a whole, so infirm that the entire trial was rendered fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991), citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  The category of infractions that violate "fundamental fairness" is exceedingly narrow, as the Due Process Clause has limited application beyond the specific guarantees enumerated in the Bill of Rights.  *Id*.  "An ambiguous, potentially erroneous instruction violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly."  *Whalen v. Trippett*, 2000 WL 977342 at * 3 (6th Cir. July 7, 2000), *citing Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998).  *See also Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008) ("When a court makes an error in instructing the jury, the proper inquiry is 'whether there is a reasonable likelihood that the jury' applied the instruction 'in an unconstitutional manner.'") (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).  Moreover, "[f]ederal habeas courts must also bear in mind that a single instruction is but one, small piece of a long trial containing a quantity of evidence and various instructions, and should judge an instruction's impact in context instead of 'in artificial isolation.'" *Whalen*, 2000 WL 977342 at * 3 (quoting *Cupp*, 414 U.S. at 146-47).

-47-

The Court need not decide whether to apply AEDPA deference or conduct a *de novo* review because, under either standard, Monroe's argument with respect to the causation instruction is without merit.[9]  Read in context, the causation instruction did not allow the jury to convict Monroe even if it had determined David Bober's death was caused by another person. Rather, the instruction clearly indicates that, in order to find causation, the jury must conclude that an act or failure to act of Monroe "directly caused death to David Bober and without which it would not have occurred." (Doc. No. 9-6 at 195.)   The trial court's causation instruction did not render Monroe's trial fundamentally unfair.  Accordingly, the Court finds this argument in support of Monroe's Sixth Ground for Relief is without merit.

### b.       Voluntary Manslaughter Instruction

The record reflects Monroe requested the trial court to instruct the jury on the inferior offense of voluntary manslaughter pursuant to Ohio Rev. Code § 2903.03.  (Doc. No. 9-6 at 173.) The State did not object, and the trial court agreed to do so.  *Id.*  After instructing the jury on the murder charge, the trial court then instructed the jury, in relevant part, as follows:

> Now, Ladies and Gentlemen, if you find that the State has proven beyond a reasonable doubt all of the elements of the offense you shall go on and

---

[9]        The Court notes that, with respect to both the causation and voluntary manslaughter instructions, Monroe's habeas claims are procedurally defaulted. As to both instructions, Monroe did not contemporaneously object at trial and the state appellate court reviewed the claims under a plain error analysis.  As set forth *supra*, Ohio's contemporaneous objection rule is an independent and adequate ground to foreclose relief absent a showing of cause and prejudice.  *See White*, 431 F.3d at 525; *Mason*, 320 F.3d at 635.  As the Court finds no suggestion of cause or prejudice to excuse his default, Monroe's habeas claims regarding the jury instructions at issue are procedurally defaulted.  However, as Respondent does not raise the issue of procedural default and Monroe has not had the opportunity to specifically address the issue, the Court will address the merits of Monroe's claims.

-48-

consider the inferior offense of voluntary manslaughter.

Let me tell you what an inferior degree offense is.  If you find that at the time of the offense the defendant acted knowingly while under the influence of a sudden passion or in a sudden fit of rage either of which was brought on by serious provocation occasioned by David Bober that was reasonably sufficient to incite the defendant into using deadly force, these are the elements of voluntary manslaughter, an inferior degree offense of murder.

Voluntary manslaughter is an inferior degree offense of murder due to an additional element in mitigation.  The presence of sudden passion or sudden fit of rage on the part of the defendant either of which was brought on by a serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force.

* * *

Ladies and Gentlemen, the burden of proving the mitigating circumstances element is on the defendant and he must prove this claim by a preponderance of the evidence.  Let me define preponderance of the evidence.  Preponderance of the evidence is the greater weight of the evidence.  That is, evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it.

A preponderance means evidence that is more probable, more persuasive or of a greater probative value.  It is not the quality of the evidence that must be weighed.  Quality may or may not be identical with quantity or the greater number of witnesses.  In determining whether or not an affirmative defense has been proved by a preponderance of the evidence you would consider all of the evidence bearing upon that affirmative offense regardless of who produced it.

If the weight of the evidence is equally balanced or if you're unable to determine which side of an issue has the preponderance, then it has not been established — then they have not established such issue.  If the defendant fails to establish the issue of sudden passion or fit of sudden rage, the State must still prove to you beyond a reasonable doubt all of the elements of the crime charged.

(Doc. No. 9-6 at 200-202.)  The trial court then went on to define the terms "knowingly," "sudden

passion or sudden fit of rage," "serious provocation," and "deadly force." (Doc. No. 9-6 at 202-

204.)

On direct appeal, the state appellate court rejected Monroe's argument that the above instruction was improper. Once again, the court noted that Monroe had failed to object and, therefore, reviewed the instruction for plain error. The court then concluded as follows:

> Although defendant finds this instruction inconsistent, the court's instructions on voluntary manslaughter were clearly stated to the jury and proper when considered in context. The subject instruction simply indicates that if the defendant did not carry his burden of establishing the mitigating factor necessary to support a voluntary manslaughter conviction, the state still bore the burden of proving the elements necessary to sustain a murder conviction beyond a reasonable doubt before it could return a guilty verdict on that charge. The defendant has not established plain error in any case. The jury clearly found that defendant had established the mitigating factor of voluntary manslaughter by a preponderance of the evidence since it convicted him of the inferior degree offense. Therefore, defendant has not established how a different instruction would have affected the outcome. The sixth assignment of error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 11.

In his Traverse, Monroe argues the voluntary manslaughter instruction was improper because "it should have said if defendant failed to establish the issue of sudden passion there could be no conviction for voluntary manslaughter since defendant failed to prevail on the mitigating circumstances of sudden passion or fit of sudden rage." (Doc. No. 10 at 24.) Thus, he claims, the instruction is "confusing, conflicting, and inconsistent" because it does not make clear the elements of the offense charged. *Id.*

Respondent argues Monroe has failed to establish a fundamental miscarriage of justice, noting the voluntary manslaughter instruction was issued at Monroe's own request. Respondent further maintains the instruction properly allocated and explained the burdens of proof and elements of the offense. Finally, he argues Monroe "has not, and cannot, establish that but for

-50-

the Voluntary Manslaughter instruction, he would have been found not guilty of the Murder charge." (Doc. No. 9 at 34.)

Once again, the Court need not decide whether to apply AEDPA deference or conduct a *de novo* review because, under either standard, Monroe's argument with respect to the voluntary manslaughter instruction is without merit. Voluntary manslaughter is proscribed by Ohio Revised Code § 2903.03, which provides that: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another." Ohio Rev. Code § 2903.03(A). While Monroe insists the trial court's instruction fails to recite every element of the offense of voluntary manslaughter, he fails to adequately explain what element is missing or otherwise describe how the instruction is deficient. Upon careful review of the trial court's instruction, this Court finds the instruction accurately states each and every element of voluntary manslaughter as set forth in Ohio Rev. Code § 2903.03(A).

To the extent Monroe is arguing the instruction is deficient because it is unclear as to the circumstances under which the jury could find him guilty of voluntary manslaughter as opposed to murder, the Court rejects this argument. After setting forth its instruction on voluntary manslaughter, the trial court carefully instructed the jury as follows:

> If you find that the State failed to prove beyond a reasonable doubt that the defendant purposely caused the death of David Bober, then you must find that the defendant is not guilty of murder.
>
> If you find– if you find that the State proved beyond a reasonable doubt that the defendant purposely caused the death of David Bober and you also find that the defendant failed to prove by the greater weight of the evidence that he knowingly acted while under the influence of a sudden

-51-

passion or a sudden fit of rage either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of murder.

If you find that the State proved beyond a reasonable doubt that the defendant purposely caused the death of David Bober, but you also find that the defendant proved by the greater weight of the evidence that he acted knowingly while under the influence of a sudden passion or sudden fit of rage either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force then you must find the defendant guilty of voluntary manslaughter.

(Doc. No. 9-6 at 204-205.)   Monroe has not demonstrated that this instruction was "so infirm that the entire trial was rendered fundamentally unfair." *Estelle*, 502 U.S. at 72.  Furthermore, the Court finds this instruction clearly and accurately describes the burdens of proof and elements of both murder and voluntary manslaughter.  Accordingly, the Court finds Monroe's Sixth Ground for Relief is without merit.

### 7.    Ground Seven

In his Seventh (and final) Ground for Relief, Monroe argues he was denied due process of law "when he was convicted of voluntary manslaughter where petitioner did not testify and did not produce any evidence of passion or fit of sudden rage brought on by serious provocation." (Doc. No. 1 at 4.)  He also argues he was improperly denied a new trial based on the manifest weight of the evidence where the evidence was inconsistent, contradictory, and "totally incredible and beyond belief." *Id*.

On direct appeal, Monroe raised this claim in separate assignments of error as sufficiency of the evidence and manifest weight of the evidence claims. The state appellate court rejected both claims on the merits as follows:

-52-

"VIII. Defendant was denied due process of law when he was convicted of voluntary manslaughter."

Here defendant asserts that his conviction for voluntary manslaughter was against the sufficiency of the evidence.

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997–Ohio–52, 678 N.E.2d 541.

Voluntary manslaughter is proscribed by R.C. 2903.03 as follows:

"(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy."

Defendant contends there is insufficient evidence to establish that he acted knowingly while under the influence of a sudden passion or fit of rage as required to submit the cause to the jury. To the contrary, the record contains testimony from multiple witnesses that David was engaged in an angry discussion with another man just prior to being shot. Both Raymond and Milton heard David yelling at another man. Milton said that man sounded agitated and mad. Dan and Crystal said they saw defendant fire a gun, after which he picked up his cell phone and said he just had to shot [sic] someone. Accordingly, there was sufficient evidence, if believed, would [sic] support a finding of the elements necessary to sustain a voluntary manslaughter conviction.

"IX. Defendant was denied due process of law when the court overruled his motion for judgment of acquittal and the verdict is against the manifest weight of the evidence."

Defendant argues the evidence was insufficient to support his conviction or it was against the manifest weight of the evidence concerning his identification as the shooter.

-53-

The sufficiency of the evidence standard is set forth above. To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Thompkins*, *supra.*

There is sufficient evidence to support a finding that defendant was the shooter in this case. Both Dan and Crystal testified that defendant was the shooter. This is sufficient evidence on which the jury could conclude that defendant was the shooter. Further, the identification of defendant as the shooter is not against the manifest weight of the evidence. The jury was presented with testimony from many witnesses. While Milton was unable to identify defendant as the shooter that night, he was highly intoxicated and in a state of shock. Raymond was not given an opportunity to identify defendant that night. The fact that Milton and Raymond's descriptions of the height and weight of the shooter appear inconsistent with defendant's height and weight, the fact remains that it was dark outside, the men were being shot at as they observed this person, and they were very intoxicated. Both men testified at trial that they were not good at estimating height and weight. And, Raymond testified that he believes that the description he gave that night was wrong. Conversely, Dan and Crystal were certain in their identification of defendant as the shooter. Both of these witnesses were familiar with defendant, who was their neighbor, and they recognized his distinctive walk and voice. There is no evidence that either Dan or Crystal were under the influence of any substance that night and they both denied having used any drugs or alcohol prior to witnessing the shooting. While there were some inconsistencies in the statements made by the witnesses over the years, it was within the province of the jury to resolve the conflicts. We cannot say that the jury clearly lost its way in convicting defendant of voluntary manslaughter. This assignment of error is overruled.

*State v. Monroe*, 2011 WL 2476280 at * 11-12.

In his Traverse, Monroe argues his conviction for voluntary manslaughter was not supported by sufficient evidence because there was no evidence of either provocation, sudden passion, or a sudden fit of rage, as required by Ohio Rev. Code § 2903.03(A). He further argues that "a significant void in this case was that Petitioner was the one responsible." (Doc. No. 10 at

-54-

29.)  He maintains the eyewitness testimony of Dan Smith and Crystal Demopoulos identifying him as the shooter was "all over the place" and unreliable.  He emphasizes that Milton Caraballo was the person closest to shooter and, yet, he could not identify Monroe in a cold-stand identification conducted the night of the incident.  Monroe further maintains the state appellate court failed to cite any Supreme Court precedent in resolving this claim and, therefore, this Court should conduct a *de novo* review.

Respondent argues Monroe's manifest weight of the evidence claim is not cognizable in habeas. With respect to Monroe's sufficiency of the evidence claims, Respondent asserts that, although the state appellate court failed to cite Supreme Court precedent, it applied the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979) and, therefore, this Court should apply AEDPA deference.  Finally, Respondent maintains Monroe's voluntary manslaughter conviction is supported by sufficient evidence in light of testimony relating that David Bober and Monroe were engaged in an argument just prior to the shooting, and that two other people (Raymond Bober and Milton Caraballo) were with David Bober at the time, thus outnumbering Monroe. (Doc. No. 9 at 38.)

Monroe's Seventh Ground for Relief appears to contend that his voluntary manslaughter conviction was both against the manifest weight of the evidence *and* not supported by sufficient evidence.  (Doc. No. 1.)  However, Respondent correctly notes that this Court may only review Monroe's sufficiency claim because manifest weight claims are not cognizable on federal habeas review.[10]  *See, e.g.*, *Nash v. Eberlin*, 437 F.3d 519, 524 (6th Cir. 2006); *accord Hess v. Eberlin,*

---

[10]     As explained by the U.S. District for the Southern District of Ohio, "under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to

-55-

2006 WL 2090093 at *6 (S.D. Ohio 2006).

With respect to Monroe's sufficiency of the evidence claim, the Court finds, as an initial matter, that *de novo* review is not appropriate.  Although the state appellate court did not specifically cite United States Supreme Court precedent in rejecting this claim, it cited *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) which expressly references *Jackson v. Virginia*, 443 U.S. 307 (1979).  Moreover, while the state appellate court does not cite the *Jackson* decision itself, it recites and applies the very test set forth in that decision for evaluating sufficiency of the evidence claims; i.e. whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Compare Monroe,* 2011 WL 2476280 at * 11 with *Jackson*, 443 U.S. at 317.  Accordingly, under these circumstances, the Court will apply AEDPA deference in reviewing the state appellate court's resolution of this claim.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363-64 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

---

act as a 'thirteenth juror' and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Hess v. Eberlin,*2006 WL 2090093 at *7 (S.D. Ohio 2006), *quoting State v. Martin*, 20 Ohio App.3d 172,175, 485 N.E.2d 717 (Ohio Ct. App. 1983).  Because a federal district court does "not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review," this Court cannot consider whether Monroe's conviction was against the manifest weight of the evidence.  *Id.*

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 317 (1979).  In making such a determination, a district court may not substitute its own

determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of

witnesses.  *See id.*; *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts

are required to give deference to factual determinations made in state court and "[a]ny

conflicting inferences arising from the record . . . should be resolved in favor of the prosecution."

*Heinish v. Tate*, 1993 WL 460782 at * 3 (6th Cir. 1993) *citing Walker*, 703 F.3d at 969-70;

*Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the

nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court recently emphasized that habeas

courts must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference.
> First, on direct appeal, 'it is the responsibility of the jury – not the court–
> to decide what conclusions should be drawn from evidence admitted at
> trial. A reviewing court may set aside the jury's verdict on the ground of
> insufficient evidence only if no rational trier of fact could have agreed
> with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ----, 132 S.Ct. 2, 4, 181
> L.Ed.2d. 311 (2011) (per curiam).  And second, on habeas review, 'a
> federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court
> disagrees with the state court.  The federal court instead may do so only if
> the state court decision was 'objectively unreasonable.'" *Ibid*. (quoting
> *Renico v. Lett*, 559 U.S. ----, -----, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
> (2010)).

*Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012).  Under this standard, "we cannot rely simply

upon our own personal conceptions of what evidentiary showings would be sufficient to

convince us of the petitioner's guilt," nor can "[w]e . . . inquire whether any rational trier of fact

would conclude that petitioner . . . is guilty of the offenses with which he is charged." *Brown v.*

*Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in *its* conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original)(citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined that Monroe's voluntary manslaughter conviction was supported by sufficient evidence.  In resolving this claim, the state appellate court accurately summarized the evidence of record and correctly identified the applicable law.  As noted, several witnesses testified that David Bober was engaged in an angry discussion with the shooter just prior to being killed. (Doc. No. 9-4 at 70- 76 (Milton Caraballo; 210-211 (Dan Smith); Doc. No. 9-3 at 202, 219 (Raymond Bober); Doc. No. 9-6 at 72-73, 121 (Crystal Demopoulos)).  Milton Caraballo testified that, just before the shooting, he heard David Bober and the shooter arguing in "angry," "aggravated," and "agitated" voices.  (Doc. No. 9-4 at 70-71.)  He also recalled "something came up, you know, about wanting to fight or box or whatever." (Doc. No. 9-4 at 75.)  Both Raymond Bober, Dan Smith, and Crystal Demopoulos also testified to hearing "yelling" just before the shooting. (Doc. No. 9-4 at 210-211; Doc. No. 9-3 at 202, 219).  While there is some evidence suggesting efforts were made to diffuse the argument and that David Bober was attempting to flee from the shooter, it was not unreasonable for the state appellate court to determine that sufficient evidence supported the jury's findings as to each element of voluntary manslaughter based on the witnesses' testimony.  *See Coleman*, 132 S.Ct. at 2064 ("*Jackson* leaves to juries broad discretion in deciding what inferences to draw from the

evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts'").

Moreover, as the state appellate court noted, both Dan Smith and Crystal Demopoulos affirmatively identified Monroe as the shooter.  (Doc. No. 9-4 at 212-215 (Dan Smith); Doc. No. 9-6 at 88-89 (Crystal Demopoulos)).  While Monroe questions the credibility of this testimony, the state appellate court was not unreasonable in determining that the testimony of Dan Smith and Crystal Demopoulos was sufficient to support a finding that Monroe was the shooter in this case.

Based on the above, and applying the "double deference" required under the AEDPA, the Court is unable to say that the state appellate court's decision "was so unsupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S.Ct. at 2065.  Monroe's Seventh Ground for Relief is without merit.

### V.  Conclusion

For the foregoing reasons, it is recommended that Monroe's Petition be denied.

IT IS SO ORDERED.

/s/ Greg White_____
U.S. MAGISTRATE JUDGE

Date: May 22, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**